Good afternoon, and may it please the Court. Today I would like to address three arguments in the order of our brief, which we call the one-year reporting, the double recovery, and then the Lamar Holmes argument. First, the District Court made a legal error when it ruled that the portion of the definition of pollution cleanup costs, any cost or expense that is reported within one year after the pollution work ends, is a condition precedent that St. Paul waived and did not show that it was prejudice. But the policy requires the scope of coverage includes not only that it be for pollution work, but that it is a cost or expense that is reported within one year after the pollution work ends. It's part of the definition of coverage. It defines the scope of coverage in the policy. So it's part of the bargain for exchange. It's essential to coverage because, one, it defines what is covered. Two, it permits St. Paul time to confirm whether the costs are appropriate or necessary. And three, it provides finality so it can close its books, permitting coverage, Your Honors, beyond the one-year period in largest coverage for pollution cleanup costs, which the courts have admitted can be enormous. This court at Matador set the rule, and the District Court's finding is directly contrary to the court's holding in Matador, which involved an oil and gas general liability policy, which like this, that defined a covered pollution incident as one reported within 30 days of its beginning. The notice was given in 38 days. It could not be waived by St. Paul. The claim was not covered. And whether there was prejudice was not even an issue. In fact, it was irrelevant. This court followed in the Starr and Dematy case with the same holding. And so because it defines the scope of coverage, then any cost or expense submitted after the one year is not covered. And the— It seems ambiguous. If pollution cleanup costs definitionally includes the two elements, the definition as well as the reporting, later on in the policy, in a section called When This Agreement Covers, the policy reads, will apply this agreement to claims or suits for covered pollution cleanup costs, the phrase that you say contains the reporting requirement, only when such costs are reported within a year of the ending date. Well, that would become surpluses. That phrase then, under your theory, becomes a redundancy. Because why would you ever define the reporting phrase separate from pollution cleanup costs if one definitionally includes the other? Well, I direct the court back to the ensuring agreement that the policy affords coverage for sudden and accidental pollution incident, affords coverage for the pollution cleanup costs, and then it defines what that is. But then later on, using the same phrase, it splits it apart from the condition precedent, which is that you've got to report. If that pollution cleanup costs embraces the reporting requirement, why would elsewhere it be speaking of the two separately in the same sentence? Well, it's just not a part of the ensuring agreement. I think the where coverage and the when are part of describing to the insured what is within those portions of the policy, but it's not a part of the ensuring agreement. That's all I can say, Your Honor, is that the ensuring agreement says exactly what it's supposed to pay. It's for pollution cleanup costs that result from a sudden accidental pollution event or incident. And so it's within the scope of that coverage. And so factually, your argument is approximately 2 million were not reported until 2011. Is that correct? Well, yes. I mean, they were out of time as to 2 million, about 2 million. Yes. 2 million dollars. And the best record support for that is the spreadsheet. I got a little bit. I mean, it's a large record. So the spreadsheet that you cite repeatedly to it, 15 0 1 5. Yes. Are you with me? Yes. Was that was that or wasn't that introduced into evidence? I don't believe that I'll have to double check, Your Honor, but all of the submissions, all of the submissions were, of course, in the evidence. Well, when you say all of the submissions, the critical repeated citation is to this multicolored spreadsheet. And I couldn't. This is my failing. I couldn't tell. Was that Cliff Smith's spreadsheet, which I thought was one in the same? No, no, no, it's not. OK, so it's something that wasn't introduced to trial. But you're saying it's sort of what a demonstrative piece of evidence is the summary chart of evidence that was introduced. I'll have to I'll have to confirm, Your Honor, but I believe it was a preparation to help explain to the jury all these invoices. Oh, OK. So it was it was used at trial. Jury had a summary chart type evidence. I believe so, Your Honor. A reply brief at 7 note 4 sets out the calculation of how the court can review the invoices in the last two submissions that were not provided to St. Paul in the prior five. Wasn't one of the spreadsheets submitted in the post-trial briefing? Yes, yes. I think that's I thought that was the one Judge Higginson's talking about. That may be, Your Honor. There are several spreadsheets. But what we did is we quantified in what the evidence said we provided to the court as to how the 2.1 could be calculated. And all the court has to do in the record in our reply brief at 7 and 8 and note 4 is to compare the last two to the prior five. And you'll see all the invoices that were not submitted within the one year. And that's that's a firm number. It's it's it's present in the evidence and it's clear in the court can use that and reduce the actual damages accordingly. If I may move on to second argument, and that is the double recovery argument. Who has the burden of proof? Who has the burden of proof on double recovery on that issue? Well, the the insured has to demonstrate that it has an insured loss, that it has costs, that there is an insured interest that is still unpaid. It hasn't been paid. Isn't an offset traditionally an affirmative defense? Well, an offset in a traditional sense, maybe. But this is not an offset. This is simply that the claims that were previously paid by the removal of records in debris insurers, we call route insurers, they had been already paid. And so they're just not a covered loss. In this case, it's not an offset. It's not an avoidance. It's simply that I didn't see any. I mean, I agree with your principle existing Texas law against double recovery as a basic policy of indemnity. But I didn't see any case law in Texas directly saying who has the burden of proof. So as I'm looking at, perhaps it's analogous to offset. I mean, do you know any cases directly on point discussing the burden of proof on a double recovery insurance issue? Just not particularly on double recovery. Just the general law that requires the insurer to prove that there is a covered loss. And of course, that's defined by the terms of the policy. But Bozeman counsel points out, and I think it's correct in the record here, this was a hotly debated point. And then we have a jury question explicitly on payments over and above what they've already received. So wouldn't it be a factual matter that's been resolved? And therefore, you'd have to show that no reasonable juror could have concluded that there's no double recovery here. Isn't the burden on you at this point? Well, I mean, yes. At this point, we have a jury finding. And this is a math equation, Your Honor. It's a pure calculus. You're accepting the responsibility on the double recovery and showing that no reasonable juror. So then we've got to go back and look at Foreman and Smith and decide, did they really match up every invoice? Well, Foreman did an actual adjustment of the RAUD invoices, of the RAUD coverage. He did an actual adjustment. Now, he went over the limit, the $5.4 million, and approved. And then they paid the $5 million. But the amounts that were paid, the $5 million, and then that were included in the Cox submission, in this case, we deducted the $400,000 and change overage to show that the minimum overlap. So whether or not he could tie the payment to a specific invoice that was approved under 5.4 is irrelevant because we, through Cliff Smith, are just the record, have taken care of that, Your Honors. By accepting that we're not going to ask for the $400,000, we'll just take the minimum overlap. And that's You've described that as uncontroverted. But Smith was cross-examined extensively on exactly sort of what Foreman's rehabilitation testimony was supposed to be. Right? In other words, in your reply brief, it was important for me to read, you said, the RAUD payment was based on invoices claimed and approved as covered under their policies. Yes. But there's no record support for that site. I thought Foreman, in the end, explicitly denied that he could ever connect the RAUD policy to particular invoices. He just stopped looking at invoices. Well, he stopped looking once he got to the limits and then beyond. But the actual invoices that he approved are known, identifiable, and those are exactly the ones that were used here. St. Paul 289, as an example, St. Paul Exhibit 289, there is a RAUD submission, an invoice from Citrovanic on a certain date, invoice 2351, that was submitted in the RAUD submission, in the RAUD claim adjustment. And that very same invoice is in Cox Exhibit 802 that the jury awarded in this case, because the jury awarded everything Cox asked for in the submissions, Exhibits 800 to 815 and 1060 to 1068. And that very invoice, Your Honor, is right here on this exhibit as well. We have invoice after invoice after invoice. This argument, which you're saying is mathematical, was made to the jury, and they just responded with their response to Question 2? Yes. I mean, is it possible Question 2 could be read, I mean, the way I read it, it said, what is Cox owed over and above what it was already paid? Couldn't that mean the $1.4 million that St. Paul had already paid? Because you did pay out some amounts on the policy. Yes. So it seems to me that the jury charge, it's not exactly clear what the over and above amount refers to. You didn't ask for a jury question specifically saying is there any overlap with these other debris removal questions? Because it seems to me that would have clarified this uncertainty. No, Your Honor. I don't believe that we requested a specific question on that. There was the evidence. Was it argued in closing by your side that the there was this $5.4 million? I looked over the closing, Your Honor, a few days ago and checked. It was not addressed. There were so many other issues that St. Paul addressed during closing, but did not go into that. But the key is, is that if it's been paid by the other insurers, it's not an insured loss as to St. Paul in this case. And that's a fundamental tenet. It's undisputed. And when you say fundamentally, you're not saying one satisfaction rule. You're saying fundamental, the indemnity principle. Yes. Yes. I mean, the legally more complicated, the one satisfaction rule that you referred to as a much more complicated joint tort, sort of pedigree. Right. It gets into tort. But this concept applies, period. If another insurer has reimbursed a specific cost of issue, and if so, there was no longer an insured interest over those costs. Thirdly, Your Honor, I want to address the Lamar Holmes argument. And you've heard in the prior case that we believe Lamar Holmes is the proper accrual rule. This court awarded $13 million in penalty interest, which is grossly excessive because it began, the accrual began many years before many costs were even incurred, 20 months before St. Paul partially denied the claim. And so we look to Lamar Holmes as the appropriate accrual rule because like in Lamar Holmes, the amount of loss here was not finite. It grew over time. And so the accrual of interest in this case, like in Lamar Holmes, runs from the date that the invoices were submitted with information, and then St. Paul refused to pay. That's when the right to the 18% matures, even though there was a prior breach. And so that system, that analog, that application applies equally to pollution cleanup costs, which similarly are not finite, but grow over time. Judge Atlas's opinion in Philadelphia indemnity would seem to start it at the earlier time, the any violation at an earlier date. I mean, the district court struggled with there's a lot of case law and no one has certainty, but that was a case that struck me as inconsistent with your reading of Lamar Holmes. Well, that may be consistent with what the Supreme Court of Texas has ruled because that cited both 056 and 058. Lamar Holmes was talking about 056, and unlike the last case here, we had an 055 violation, which says you didn't even take that first step of asking for that information. So I don't think the whole, let me ask you this, as I know your time's running out, but you seem to be saying that only Section 58 triggers a penalty because it's the only one that in its language actually refers to a penalty, and there's actually, I mean, that makes a lot of sense from a plain language perspective. But it seems to me all the Texas appellate cases I've looked at reject that view. Have any adopted that view and say only a Section 58 violation starts the clock for interest? Well, actually, this court has described in performance out of plex that it's when the insurer does not pay. There are many cases from this court describing the insurer's failure to pay triggers the accrual of interest. So it's a payment deadline, not a claims handling deadline. That's the alternative argument to Lamar Holmes. Let's see my time's up. Thank you. Okay. Thank you, Mr. Treasurer. Mr. Jamison, we'll hear from you. May it please the court. My name is Jack Jamison, and together with my co-counsel, Alexandra Stravinsky, we represent Cox Operating, and we have for six years. So we're a little bit emotionally invested in it. I was going to begin my presentation, but there are so many questions that I'm going to try to address those right off the bat. To begin with, Justice Higginson, your question about the overlapping one-year reporting provision is a wonderful one, and the best way for me to explain why the other one, which says, and incidentally, you have a handout from me that includes both of them, plus the definitions in them. That is the other provision that shows how ludicrous that St. Paul's argument is in this case. But what you have to understand first is essentially two background issues that have finally been resolved in the case. The first one is you have to understand the nature of the liability with which someone in Cox's position is faced after the discharge, because there's really two forms. And both are covered in this policy. One is first-party liability. One is traditional third-party liability. You must understand them because it demonstrates the absurdity of this one-year reporting argument. Okay. The first, under the applicable statutes, and we're talking about the Federal Water Pollution Control Act as modified by OPA 90. You're talking about the National Contingency Plan, which is the EPA regulations under the statute, and the Coast Guard regulations. What the first obligation is of an operator who's faced with a situation is they must immediately begin to remove the discharge from the water. Okay. And in the process of doing so, they must comply with the directives of the Federal On-Scene Coordinator, and they must do it in a specific manner specified in the Coast Guard regs. Okay. That's what you have to do, and that's what my client did. And what that consists of and what was largely disputed is covered by St. Paul, and this is material, is they said that the removal of hydrocarbon-containing vessels, equipment, pipeline that were on the bottom of the the cost of picking up and removing those was never covered on this policy. Absolutely, categorically not covered no matter what. That was their position, and I'll explain when they asserted it because it's also inconsistent with their second argument for this credit. Okay. If you don't do what you're supposed to do as a good operator and clean this up, the Federal Government comes in and does it for you, then they make a third-party claim against you. Okay. So what happened in this case, Cox did what he was supposed to do, okay, and they gave no, and not only did they do that, they immediately, well, it's admitted that we triggered the Matador-like provision in this policy. We made a claim within timely fashion, and this is the first entry in the claims journal by the adjuster. We complied with Matador. Okay. That was September 27th. We did so. Then later, of course, we also made the official written notice of claim pursuant to the Texas Prompt Payment Act, which is October 17th of 2005. Now, what was supposed to happen in September of 2005, just a month after Hurricane Katrina, what was supposed to happen was that St. Paul was supposed to begin investigating this claim and requesting the invoices. Why were they supposed to request the invoices? Because this is a liability policy. This insuring agreement is identical to the traditional bodily injury property damage insuring agreements, the advertising injury, personal injury provisions. If you look at them, they are worded exactly the same. We will pay all amounts for which a protected person is legally liable. So St. Paul was supposed to directly pay each and every cost that Cox was incurring as they were performing their obligations under the act. Now, Judge Miller, this was a contested issue at one time. St. Paul took the position that it was an indemnity policy, which is absurdity because there's two provisions in the policy, I call them exceptions, prove the rule in the policy. One is the deductible endorsement. It says, look at the deductible endorsement, there was no endorsement originally. They add an endorsement that says now St. Paul, I'm sorry, Cox has to pay $10,000 as a deductible of the cleanup costs as they're being expended. It says it changes the coverage. And so it's an endorsement in the first party. And Judge Miller specifically found that they were obligated to pay them as the cost, the liability was being incurred. They have not challenged that on appeal. But now, just because your time's running out. Yes. Challenging the $2 million that they say was reported late. Okay. It wasn't reported late, first of all, under Matador. We're talking about two different. Except Matador. For the sake of argument. No, Matador's correct. I know, except that it even applies here. It's not a condition. Okay. Just accept that for the sake of argument. Your response then is we still reported it and we know that from their letter of denial? Is that the response? Matador says report means tell them about. Yes. And of course, St. Paul versus Davis says, what are you going to tell them about? You're going to tell them about the amount. Yes. Okay. If report means what they claim, which means physically deliver invoices to them, then we were supposed to, under the Matador provision, physically deliver. Matador doesn't say that. Let's say Matador just says notify them. Yes. Not give. Okay. Let's say you're right on that. Yes. What's the best record evidence that the notification occurred in the full amount? It's not item by item. I know it's not item by item. The denial letter itself says they knew we already had $15 million and were rising. Their complaint is it was so much. Now, all we actually saw, all we actually proved at trial through our presentation, because they actually proved some more for us, which makes their second argument absurd, was $10.9 million. Okay. Now, as they were supposed to be paying these directly, okay, that makes the one-year reporting provision that they're concerned about absurd because why would you report something to an insurance company that's already paid the invoice? Ah, so why is it there? Well, it's basically under the facts of this case has no application. Under the facts of a third-party liability claim, that's what the other provision addresses. If you'll look at the wording on that handout, you'll see it's more directly addresses this temporal nature. Okay. What it says is we'll apply this agreement to claims and suits, okay, or under the primary policy, and I'll explain why, amounts voluntarily incurred by the insured, because under the primary policy, it covers not only amounts for which you're legally liable, but also those you just do out of the kindness of your heart. Okay. And so now the excess does not do that. It only covers legally required to pay. So what the one-year reporting provision is for, and again, it's in both the primary and the excess, and it actually says when this agreement covers, it's for when the insurer doesn't pay them directly and has no idea about their existence. For example, say the insured complies with an matador provision, which we did, and it's admitted, and then they go out and start voluntarily incurring costs, and they never tell the insurance company until years later. Well, the insurance company, it's going to be a sneak attack. It's going to be a surprise. Okay. In fact, there's even a two-year statute of limitation built into the policy for voluntarily incurred costs. The other one, and it's really more important because it applies to the excess policy, is if the operator doesn't clean up, or the owner, whatever the case may be, and the feds come in, federalize the job as they call it, they do the cleanup, they send you a bill, they demand you pay it. Okay. And then you don't. Ultimately, they file a claim, which, by the way, does include under the definition, it's on the second page of my handout, the definition, is a claim is a third-party claim by the government. The definition doesn't say a third party, but the defense obligation makes that clear. They defend, just like they do in a normal standard liability insurance provision, they would defend the insured against a governmental claim for cleanup. That's when it's relevant. It has no relevance whatsoever when, if you don't breach the policy, like St. Bruce's in 2005. It's not when they denied the claim. They were supposed to have paid the $10 million we incurred by the time they denied the claim. Well, technically, we incurred another $4,000 the next month. But we had already incurred the entire $10.9 million. They were supposed to have paid every single one of those invoices directly on our behalf because that's what the in this case that they did not take up on appeal. That's why it was so pernicious that they didn't request a single invoice for eight months after the notice of loss. Lamar Holmes has nothing to do with this case. Lamar Holmes postulates a situation where the insured, because you've got to remember what the situation is, Lamar Holmes, was a duty of defense question. Typical duty of defense situation is insured gets sued and he sends it in to the insurance company. Well, they've already got everything they need. They don't make a 5-5 request. They've got four corners rule going on here. Occasionally you'll see a request, but rarely. And then they deny the claim. Okay. The Judge Acosta, when you first read Lamar Holmes, and I'm really talking about, I think it's the third paragraph up, which is the one you were referring to, it's not actually talking about 5-6. I know they've got a citation. You've got to read. There's only two operative paragraphs in the whole opinion. And the one you're talking, the first one goes through all the provisions in the statute, and all it does is quote them, except it makes one mistake. The wording in 5-6 is not the same wording in 5-8. It is not. One says this business about secure proof of loss. Well, by the way, it is answered in the case law. It has nothing to do with the extent of the loss, its coverage. Is it covered? Now, I understand, Judge Jolly, the dilemma it creates for you, because you might not have everything. You might not know the extent of the loss, and you've only got five days to answer the question, I mean, to pay the claim after you've accepted it, or 20 if you're surplus funds. But the protection is actually in the period where you comply with 5-5. Then the insurer is going to have to give you everything. That's your protection. Or in 5-6, where you get the extension. But Judge Acosta, read very carefully the paragraph that you were referring to that has the citation in 5-6. It's talking about a problem raised in the TIG case by the Dallas Court of Appeals. The problem with, they're not talking about when does the interest accrue. They're talking about when do you have principle on which to compute the amount of the penalty. Because the problem is when the insurance company denies the claim, there are no damages. Period. There isn't a principle. Okay? And you can't even project it out through an expert witness, well, the reasonable cost of defense is X, because you know what happens in this, what they said in TIG, well, many a times the insurer just defaults. He doesn't have any defense costs. Or he enters into a sweetheart judgment. Or he might defend himself. So the questioning from our homes, because you've got to remember what they're answering. Of course, their answer is just yes. Does the act apply to a duty of defense breach? Okay. What about, are you going to address the double recovery issue, their second point? The double recovery, of course, now this is the kind of the funny part of it. They never, they were never seeking credit at any point until after they got hit with a large judgment. Because, and you have to look at their summary judgment motion, because it's completely inconsistent with their theory. Their primary coverage position was, and they literally say this, because I want to tell you what they say in their summary judgment, their summary judgment motion on removal of debris. They literally say there is no overlap between the property insurance removal of debris coverage and the St. Paul coverages. Did you argue it wasn't properly preserved though? Of course I did. Because it wasn't. It was in their post-trial motions. I have, that's in my brief. They have never raised the issue until post-trial. Now, let me explain what I mean with that. Their coverage position was always that there's no overlap. They said in their summary judgment motion, or one of their replies, and I can give you the citation, they actually say we never pleaded this issue because there is no overlap. They admit it, now that they come in this court and they try to act like they pled it. You know what they cite to? Their erroneous pleading that it was an indemnity policy. They don't ever ask for a credit. It is an affirmative defense. Can I explain why? Well, but Cliff Smith tries to say this. Cliff Smith, by the way, if you look at the record episodes, they've got this little label about him being in a justice report. Cliff Smith was a expert witness hired in 2011, four years after the claim was denied. You cross-examined him on that. Okay. But he still, nonetheless, said what you just heard opposing counsel say, which is if you track invoice by invoice, in the $5 million paid for the RWD, those same invoices appear. Right or wrong? Well, first of all, Cliff Smith's report riddled with errors. The spreadsheet? Riddled, yes. Riddled with errors. Multiplying the amount that Cox is claiming, in some occasions, by two. But what about that essential factual, they called it, mathematical point? Would we find that an invoice submitted for the pollution claim was also submitted and paid off in the wreck claim? That brings up a funny point. And the answer is, sometimes. But the reality is, you know, they have led you to believe that Cox submitted these invoices to the property insurer first, and then the property insurer completely backwards. But if you look . . . I mean, you obviously have been with this case for as long as you have. Yes. If you're agreeing that even one invoice was, does that trigger mid-continent? Or does the question to answer . . . I mean, there are layers to this. The question to answer, I hadn't thought Judge Costa's point, but what if the over and above refers to the earlier payment as distinct from the wreckage payment? Well, no, the point's even better than that. I mean, it secludes that. They tried . . . see, the jury found against them. Yes. And they have decided they've gotten to the jury's head and figured out what the jury did. Because we proved up $10.9 million of cleanup costs. By the way, St. Paul added a whole bunch more for us that we had changed our mind on. But let's say it was still paid off identical invoices. What's the consequence under mid-continent? You do not know the basis for the deduction. You know what the deduction might have been for? Property insurance. We don't know why the jury deducted the money from the amount we proved up. Besides, they had so much to work with, more than the $10.9 we started. But I was really close. If you take off the $1.4 you were previously paid from your demand, it's really close, isn't it, to what the jury awarded you? I thought you got just about everything you asked for. Oh, it's close, no doubt. But the problem is, you know, we're talking about a matter-of-law point here. They say something was established as a matter-of-law point. Well, I can tell you a fundamental defect. You have no idea if the jury deducted the property insurance payments in part or whole themselves. You do not know why. And Mr. Forman specifically said . . . see, there's a dislodge . . . He specifically said the invoices don't track. Yes. And he's the . . . I understand. I understand. I don't mean to cut off, but you have a little bit of time. I'd love to hear your answer on Philadelphia indemnity or the interplay of the penalty interest. Switching to that third issue. Oh. Your cruel date. Well, first of all, and I would recommend the new opinion we cited to you all that came out of Jane Boyle's court, Northern District of Texas, knocks down every single St. Paul argument. Wonderful opinion. She says date of violation because that's, of course, what 6-0 said. And Lamar Holmes says the same thing. They like to pick pieces out of cases and disregard the part they don't like. Lamar Holmes says you get hit with a penalty if you fail to promptly respond or, with a big or underneath it, fail to pay on time. Every single case. Texas. Guide 1, which appears to be a date of loss plus 60 days. If you read it, they actually keep saying, no, the trial court erred, but since nobody raised the issue, I'm just going to say, since it's the latest date, the 5-8 date, I'm just going to let it stand. Same thing happens in the other opinions. The best one would be Dallas Court of Appeals Farmers v. Cameron case. They specifically say twice, hey, you guys are missing the boat because this is a 5-6 violation and it actually runs from the day of the violation, but since you guys just won it from 5-8 violation, okay. That's what happens in the opinions. Now, the one thing I want to say about Lamar Holmes, they are trying, it's not comparable to our situation. And Justice Boyles does this in her Devonshire Realty opinion. She specifically recognizes there's a physical loss. It's completely different from the case. Mr. President, you have a few minutes for rebuttal. Thank you, Your Honor. I want to clarify the spreadsheet that we mentioned was, at the very beginning, the 15015 record site was submitted post-trial in our post-submission filings, just to clarify. So that helped the judge in our post-verdict, post-judgment motions to show the evidence is. If I may quickly, several things. First of all, neither Matador nor Davis say what has to be included in the notice. Davis, the word amount, that's not in the policy provision. And Cox says that it's estimate, he's talking about the estimate in June of 2007, it was just an estimate. We know one thing, it has to be something more than just an estimate. Just, this is what the figure may be. We don't know. And, of course, it changed dramatically over time. And so that's nowhere in the policy and it's dicta in Davis. First of all, if I want to address briefly the preservation in the double recovery. They make a big point about that, but it's in the evidence. First of all, it's not affirmative defense, as I said earlier, that need to be pleaded. And the pleading that was in talked about the claim is barred to the extent that other policies provide reimbursement or indemnity. That's enough to put on notice. But it gets even better than that, because we argued in the JMOL motion and in the renewed JMO motion, these issues. And as this court has held, if an argument is made at a pragmatically sufficient time without prejudice to the other side, then it's sufficient. That was a U.S. Chambon case. And in the pretrial hearing, Your Honors, that Cox says that we basically said we weren't seeking an offset, that's misleading because the context of that statement was in a motion in limine hearing in which the court asked. So, first of all, before that, we argued extensively in that pretrial hearing, Cox is not entitled to a double recovery. It's not entitled to a double recovery. You'll see that in the language. And then if you go further, and this is at page 17083 of the record, that's key. 17083 shows that before the trial even began, we were talking about and addressing the concern over a double recovery. And in the context of, well, it may not be a traditional offset, an avoidance perhaps, but here we're talking about it's just not covered because it was already paid. Now, this is the first time I've heard that the spreadsheets, that whether it's Smith's work or whether it was the adjuster for the ROD, WD coverage was improper. That's the first time because it hasn't been contested that 5.4 was approved, 5 was paid, and that you take away the 400 overlap to get the minimum overlap of 400,000 excessive over 5 million. You take that away to get the minimum overlap of 2.1. That figure has not been contested until today. It's an item that the court can look at. St. Paul Exhibit 289. But millions were claimed for the debris removal policy that weren't paid, I thought about 10 million. So, the whole key is your spreadsheet being able to pick out which of the invoices were actually paid to make up that 5.4, right? Or am I missing something? Well, it's more than that. They approved the 5.4. We have those invoices. That's in the record. By invoice number, the 5.4 approved. They paid out of that 5.0 million. Now, then we have those very same invoice numbers in the Cox submission on which the jury found up to 2.6, but we took away that overlap to get to the 2.1. So, that's the minimum overlap. We've accounted for that. So, it doesn't matter if he can tie the 5 million to each invoice. We know it's at least 5.4 million of invoices, but let's take out the 4 and see what we have of the difference. And that's in the evidence, Your Honor, and there's just really no dispute on that. Now, briefly as to Lamar Holmes, I know my time is about out. Nothing in Lamar Holmes limits it to 5.056. Page 19, it cites both .056 and .058 in holding that the deadline for accrual runs when you have the two requirements. Thank you, Your Honor. That concludes the arguments that we have.